Good morning. May it please the Court, Randall Schmidt and Chandler Park appearing on behalf of Frost-Tsuji Architects. Can you speak up so the people in the audience can hear you? Can you hear me now, Your Honor? Now we can. Okay. Thank you. Can you close or move the microphone? Thank you. At the outset, let me note that what we're primarily reviewing here are motions for summary judgment. Importantly, because we are also talking about architectural works, those works have had special protection since the passage of the Architectural Works Copyright Protection Act in December of 1990. That's important because this Court, in the Garcia v. Google case with the Ninth Circuit sitting en banc in 2015, Yes, Your Honor. Great decision. The Ninth Circuit told us there that when you have a regime for analyzing the copyright of a party, and in the Google case, it was contracts and works for hire. Here, we have architectural works and a contract. In that case, it is improper for a court to revert and try to use the analysis for an implied non-exclusive license. So the effects case should have never been referred to here. Importantly, when we look at the contracts, here there was a letter agreement between Firasuji and Highway Inn. That agreement had specific contract copyright language itself, and it did two other things. It referenced the use of standard AIA contract language, and the parties contemplated that there was going to be a follow-on, more full and complete AIA form agreement, which the parties did eventually, which Firasuji prepared and submitted to Highway Inn on February 1st. Highway Inn reviewed that draft, came back with a series of questions and suggested revisions to that agreement. Firasuji immediately, over that weekend after receipt, made every single one of those revisions and answered all the questions and submitted the agreement back to Highway Inn for execution. When we look at the Johnson and Morningside cases, the court tells us that shows the intent of the parties. And here the lower court should have looked at that as the intent of the parties and used that copyright language and therefore not inferred an implied non-exclusive license. Let me just try to clarify, and correct me if I'm wrong, because of the gagnon factors. Why weren't the parties engaged in an ongoing relationship, one of the factors? Didn't the letter of agreement show that Firasuji, is that correct? Yes. Was the architect of record throughout the project and the letter of agreement would not be terminated until one of the parties affirmatively chose to do so? You are correct, Your Honor. Am I correct? Well, assuming that the terms were not incorporated, why doesn't that answer the question about not being able to revoke or terminate? I didn't understand Your Honor's question. On the gagnon, and here to clarify, the parties did anticipate that Firasuji would be involved from the conceptual design all the way through the completion of the project. But that doesn't just go to the issue of whether there was an implied in fact contract. There was an actual contract here, Your Honor. We don't have to imply a contract. We have the terms of the agreement, and when you look to the two things, if the court would have been proper to look at the standard AIA terms with respect to copyright ownership and termination of license because the AI terms are uniform on that. Highway End never objected to those terms. They knew what those terms were. But if the court didn't want to go that far and interpret the contract, what the court did here is the lower court found that the contract was ambiguous. When it found that the terms of the contract were ambiguous, which I don't believe it should have, but when it found that, it should have noted that that is a material fact and therefore should have denied both the motions on that copyright issue, Your Honor. So your suggestion is that Gagnon never comes into existence? I don't believe that you need to go that far, Your Honor. But if you do and you look at the three parts of Gagnon, there was supposed to be a long-term relationship between the parties from beginning to end of the project, and more importantly in the third test, what was the intent of the creator? The creator, Frost Tsuji's intent was that if it was paid in full, then it would grant in accordance with the AIA standard terms, it would grant a non-exclusive license to use its work for the restaurant. That did not happen. So when Frost Tsuji was terminated and then when it also itself terminated the agreement, it sent out a series of cease and desist letters. It says, do not use, you do not have a right to use our work. You don't have that right. And in fact, Highway Inn and the other defendants tried to convince Frost Tsuji that they had a, quote, fresh new design, that they weren't using Frost Tsuji's work. But in fact they were, and that's part of their misconduct from the very beginning. And that misconduct, since we're at the intent point, Highway Inn's principal, Monica Toguchi, knew for certain that she did not have a license to use Frost Tsuji's work. Although Highway Inn failed to disclose the two April emails that we eventually got from Kamehameha Schools, those emails, which were in a string on the same day to the same parties, did not show that Ms. Toguchi told her landlord that she did not have a license. And once the court found out, and we disclosed to the court this improperly withheld April emails, the court should have granted our reconsideration at that point and reversed its decision on the motions for summary judgment, Your Honor. Let me ask you about a couple of the cases that you cited in your brief. I think Nelson and Johnson. But in those cases it seemed to me that it was this very specific language that you often see, which is that these documents that come from the architect are not property of the owner and you can't use them in any way. And even if you want to use them for the completion of the project, you can't. But we don't have anything like that. So I'm not quite sure how you think we should invoke those cases here. Because the Johnson and Morningside cases are so similar, Your Honor. They're cases of termination. But there the court was able to look at basically the standard AIA language. And if we look at Section 9.3 of the General Conditions, it specifically says that if you can use, you, the owner of the project, can use our work if you pay us promptly. If you don't pay us in full and if you don't pay us promptly, you don't have that right. I wish we did have that here, Your Honor. But at a minimum, the lower court. But it seems to me that this is comparing apples and oranges to a degree because that's that contract and we're looking at contract language. And here we don't have anything like that. We do have the reference in the letter agreement, Your Honor, to the standard AIA terms. And if we look at the Stahl case, which tells us there are no magic words that you need to use for that reference, and then refer to the two Hawaii cases, Safeway and Ueshiro, they tell us that you need to do two things for a reference to be effective. Number one, there has to be a reference. And here we know what that reference is. It's to standard AIA terms. And secondly, that reference document or those reference materials need to be easily accessible or obtainable by the other side. And here, standard AIA terms, you can go online and find them. But importantly here, Your Honor, Highway Inn had the contract. They had the draft agreement in February. They knew what that language was, and they didn't object to it. So if the agreement had been carried out as originally contemplated, there would have been no license to? If the draft AIA agreement, which had been revised, had been signed by both sides, and Highway Inn had paid Frost, Suji, and Fool. Let's say that we got paid all the money that was owed us. The AIA language says that with that, you, the owner, have a non-exclusive right to use it for this project. And that's what should have happened here. When you say that, you mean that they? Prompt payment, release, actual granting of a license to Highway Inn to go use it for that. And that didn't happen here. That didn't happen because Highway Inn didn't execute the contract. Terminated the agreement. Correct, Your Honor. Right. But after the termination, Frost, Suji revoked any license there was. And the court should have looked at that as been effective and not granted, and not gone and implied a non-exclusive license. In other words, you shouldn't assume that all of the provisions of the contract would apply in the event that the contract were not terminated, if the contract were terminated. Correct, Your Honor. I mean, if you're not going to pay for it, you don't get the benefit of it. Right. Let me turn briefly, if I could, to the DMCA. There are three to prove 17 U.S.C. 1202B violation under the DMCA. You need to do three things. Number one, the material has to have CMI on it. We have that here. Number two, there had to be removal of that CMI. And that's kind of what some of the defendants have disputed. And then you need to have that removal to be intentional. Those are the three elements of that. So let's look at what we were able to show, even at a sobering judgment level, about the removal of the CMI. Number one, Skip Elkins, the principal at Bargreen, the kitchen equipment supplier, and Bargreen admitted that they had removed the layer that had our title block and CMI from the CAD drawings. There's removal. That wasn't negligently done. They didn't miss that. They purposely removed it. Later on, we also found evidence at Highway Inn's material that it had, in the old save document, it had transmitted Frost Suji's CAD drawings to the new architect without the CMI and title block on it. Again, Highway Inn knew exactly who had done that work. They knew that our title block was on it. And importantly, when Highway Inn was negotiating with Mr. Uehara, the successor architect, Mr. Uehara required that he get an identification because he knew he was going to use Frost Suji's work, and he knew he was going to get in trouble for it. But he did it anyway. He put his own title block on those documents and his own stamp on those documents, which indicated that this was work under his supervision. This raises an interesting question, though, about the scope of the DMCA. If the implied license is upheld, then would you be able to say that there was this concealment of an infringement if, in fact, there was an implied license to use the data, and why is that? Because even if you have a license to use the works, those works still need to be attributed to the creator. That's what the DMCA says. You could have a license to use it, but you can't strip it of my copyright and then assert that it's, you know, yours or someone else's. Usually in these DMCA cases, somebody else is claiming the copyright, but is there any affirmative claim that prejudiced your client other than you disagree about the implied license? I understand that. So I'm just kind of putting that over here. In your view, could you lose on the implied license and win on the DMCA? Yes. Okay. And how does that happen? It happens because we have been able to show that there's been CMI removed, it was purposeful, and then others used those documents. So although you might have had a right to use the materials if you would have paid for them, when you strip off the CMI, that in and of itself, and you do it intentionally, when you strip off the CMI, that in and of itself triggers a violation of the DMCA. Does that mean that the other people who were using these drawings were relying on the absence of the information on it in order to think that they had a right to use it, that they would be on notice that they couldn't use it? Importantly here, Your Honor, Frost Suji's prior counsel sent out a series of cease and desist letters. I think there were three sets of them in May, June, and July, right as we got involved. And those cease and desist letters clearly told all the parties involved, JKI, Highway Inn, Uehara, all of them, that they had no right to use this because we understood that there were representations being made, that we had been paid in full, and there had been a license. You see, that's where we're now just wrapped right back into the implied license. This is where I'm having some trouble. So if there was an implied license, then they may have removed the designations, but would that be still a violation? And I'm not sure you completely answered that because you wrap back in the assumption that because you told them they didn't have the right to use it because they hadn't paid in full, there was no implied license. So I feel like we're kind of like in a Mobius strip or something. I was answering the license question, Your Honor. Right, I understand. And not trying to destroy my answer on DMCA. Okay. Let's say that Frost Fuji had been paid in full, and then its work was being used. If another party intentionally removed that CMI, that would still be a violation of the DMCA. All right. Did you want to save your remaining time? I would, Your Honor.  Good morning. May it please the Court. My name is David Major. I represent Highway Inn and Hoala Mau. Our office has requested 13 minutes of the 20 minutes for this side. And a quick question. Will the yellow light come on? No. When you say 13 minutes, I mean, excuse me, when you say 7 minutes, your time is up. Thank you, Your Honor. I'll try to warn you. In my time here today, I'd like to address three points. I think it's really important for the Court to understand the procedural posture of the underlying proceeding because we have two separate standards at issue here. We have the de novo issue, which has to do with the dispositive motions. Importantly, the cross motions below on the license issue. And then we have basically all the attempts after that for reconsideration, which is subject to the abuse of discretion standard. And so when counsel is talking about the mix and matching of evidence and jumping around, he's sort of ignoring the fact that the parties very early in the case, Ross Suji filed the first motion for summary judgment and admitted there was a license. They just believed that that license was terminated pursuant to a B-101 because it was their position that that document was expressly incorporated into the letter agreement. In response, Hiawean filed a cross motion for summary judgment. They very clearly opposed the incorporation by reference issue, and they stated they believed that the law permitted an implied license due to the objective facts that were at issue before the judge. The judge had a very limited record in front of her. Both parties pushed their chips in on this issue. They took two distinct legal positions. Once the judge denied the incorporation by reference and found that the implied license was appropriate due to the objective facts in front of her, then Ross Suji spent the remainder of the time trying to take discovery, trying to file reconsideration motions, trying to create the very evidence that it should have created before it fired that first motion for summary judgment. I think that's important to consider before the court because those efforts are subject to an abuse of discretion standard as opposed to the licensing issue, which we can discuss further. Well, if you look at what the district court ruled on in the summary judgment, what precisely was before her then? What was precisely, the district court is very clear about this because she's trying to exclude people trying to add to the pile later on. She says, look, you guys put the letter agreement in front of me, you put the proposed B-101, and you put some declarations basically stating what the positions of the party were at that time. Those are the two operative documents at the time. Once Ross Suji lost its incorporation by reference argument, which under Hawaii law, the language in the letter agreement is not sufficient in order to accomplish an incorporation by reference. It has to be expressed and it has to be particular. I understand they don't have to be magic words, but Ross Suji was trying to pick and choose based on vague references to the AIA contract. And I would say that that's material. Are you saying the AIA contract itself was not before her? The AIA contract was before her, but what she was considering was the party's agreement at the time they entered into the letter of agreement. And she determined that the letter agreement did not expressly incorporate the AIA terms. That's absolutely correct, Your Honor. And Ross Suji argued that it incorporated some in part. It incorporated the entire agreement. But the fact of the matter was is the representation of the parties operated pursuant to the AIA agreement is wrong, and it's not factually supported by the record. It didn't happen. Okay, well, at the risk of oversimplifying, what you had was a letter agreement, a tentative agreement that we're going to design this for you, and if we design it for you, and everything goes according to HOIL, then we're all subject to this agreement that's the AIA agreement that says that you can use what we do. Your Honor, respectfully, I would disagree with that fundamental assumption. The letter agreement actually says that these are the terms, and there's some payment obligations attached to them, and it says the parties will endeavor to execute or convert to an AIA agreement later on. Nowhere does it say that it expressly incorporates the terms of the AIA. No, I understand that. That was their contemplation. Well, yes, that some agreement would be subsequently executed, but that by a certain date it would be offered. It wasn't offered by a certain date. And then the proposed draft that was offered was heavily modified. Well, at the risk of oversimplifying, with the documentation that was before the district court, what gave you the right to use the work that they did without paying for it? Well, the district court, one, found that the document wasn't incorporated by reference, so then the focus was on what is the language in the letter agreement. And the language in the letter agreement, and this is very important, because Frost Suji hopes to mix and match the term licenses and copyrights as if they're the same thing. They're not. There's a copyright term, and it very clearly applies only to ownership. There is nothing in the letter regarding the right to use. There is nothing with respect to termination. There is nothing with respect to ongoing participation. The letter agreement is very simple, but the absence of the protections in the letter agreement. You're saying that the letter agreement didn't say you didn't have the right to use. You didn't have the right to use. Sorry. I don't understand. You're saying that their argument is that the letter agreement said you don't have the right to use this. But my question is what in the letter agreement gave you the right to use this? The court considered the objective facts at the time of the agreement, and the objective facts were that Frost Suji intended to provide designs that were to be used for the development of a discrete set of work, which was the build-out of the restaurant, and that those plans would be distributed to, just like they were, to kitchen designers or engineers or contractors as they were needed in order to build it. And the evidence also indicated, there was some e-mails attached at the time, that demonstrated that Frost Suji had, in fact, distributed those works for everybody to use in the project well before they issued the proposed B-101. And the problem is that if you look at the objective facts, what's in the letter agreement, not as incorporating the AIA, then those objective facts do not show that Frost Suji made any effort to protect the licensing rights of the use of the plans. But if they did the work and circulated and distributed their work product, that that meant that you could use it. They did not. Somehow there's something here that doesn't seem fair. Okay. Because you used it and didn't pay for it. The contract was terminated. Well, I think that the non-exclusive implied license, I guess if we look at it from a more, what's the copyright objective of a non-exclusive implied license? And we look at, like, FODE. FODE looks at it and it says, you know, we don't want architects where they don't have express limitations on use or licensure, we don't want them holding projects hostage over simple contract claims because that's their avenue. They go in, and in this case we owed, they claim we owed $39,000. And instead what they want to do is hold the project hostage, amass this big copyright claim, and the judge looked at it and said, look, you had the opportunity to attach a B-101. Is that all the money that's in the balance at this point other than the DMCA claim? No damages were ever offered on the DMCA claim. No, but, I mean, is there any other money on the table or lost at this point? There's no loss at this point. It was paid. So have they gotten completely paid? Well, I'm just asking. Our position is that the contract claims have been resolved and the full amount is covered by, so. Well, that doesn't answer my question. That sounds like a lawyer answer. At the time the motion was heard, Your Honor, there was a dispute over $39,000. And was there any avenue for that amount to increase? No, they weren't providing additional services. I know you both spent probably at least $39,000 to come here, so I'm having some trouble understanding why, as a practical business matter, why we're here. Well, we did the entire case as well, Your Honor. But $39,000 was left unpaid, is that right? $39,000 was left unpaid under the contract. But if you have an implied license to use something, doesn't that also, isn't there an implied license fee back? No. The Cohen case says that nonpayment or a payment dispute does not terminate an implied license. No, it doesn't terminate the implied license, but it also doesn't terminate the obligation for a fair implied license fee, does it? Fair implied license fee. I mean, it says it doesn't, if you have an implied license. Yes, Your Honor. What the case says that you're talking about is just because you don't pay the money doesn't mean that the license ends. So you can go ahead and build your restaurant. But it doesn't mean that there shouldn't be some fair implied royalty license or other feedback. Well, Your Honor, under these circumstances, I would say that Frost Suji drafted the letter agreement. They put a termination provision in there. They placed no limitations with respect to the effect. How much did you pay for the? I'm sorry, how much did we pay for what? For the drawings that you got. So there was a specific contract amount, and then there was some additional services amount. The total ended up being roughly in the neighborhood of $97,000 was in dispute. We asserted that we didn't owe that much. However, on the record. Had you paid something already? $58,000, $59,000. And that's where the $39,000 delta comes from. Right, and that's consistent with FWAD and what the district court held, which is clearly the owner paid for something. And was this case ever referred to mediation by the Ninth Circuit? By the Ninth Circuit? Yes, Your Honor. There is an attorney's fees component of this case. It is not insignificant. Right. So. All right. With respect to the DMCA claim, the evidence that was before the court was completely insufficient to establish, one, the intent element, and two, because the court had found that there was a non-exclusive implied license, Your Honor is absolutely correct. You can't meet the last prong, which very clearly requires copyright infringement. If you have a license, then you can't infringe. If you can't infringe, you can't violate the law. So as to your question earlier, if they do not win. There does seem something. I've seen a lot of cases where people, you know, try to remove restrictive markings on various documents, whether they're trade secret documents. I mean, obviously, in a copyright case, you have a copyright without the actual putting the C or the CMI on it. But we have a special case here where they put it on there. So there's something that seems odd that with impunity you could remove it. It would be one thing to use it, but it seems like it's another thing to remove it. So would you distinguish between the two if there is something to be distinguished? Sure. First of all, there was no evidence that any party intentionally removed the copyright management information. The representations of FTA's counsel as to Skip Elkin's declaration are just not accurate. That's not what he says. What he says was is he took the digital components that he needed in order to address the layout, not that he removed it for the purpose of infringing on FTA's work. And the cases, just like they say, that you can't photograph is the best example, right? If you put the copyright at the bottom and you take it off and you make a million postcards and make a bunch of money, then that's DFCA violation. That's not what happened here. What happened here is you have the cases that are talking about the right to copy, reproduce, the sketch ones where you can draw or outline it. Those cases indicate that with an implied license, you're allowed to take those kind of privileges in order to, you know, validly use your implied license or your right to use, reproduce, and copy. I see I'm down to my question. Let me just ask in terms of the evidence before the district court, these were in digital form when they were copied or used? For the purpose of the motions, we had already conceded copyright ownership, right? Copyright ownership never left the architects, right? Right, that's right. And so we had the right to use at that point. Right. So essentially we, there was nothing from Highway and Hualamao, any of the parties all submitted declarations saying that they never took that CMI information off. We submitted declarations so they didn't even know how. And then there's one declaration and it's Skip Elkins. Right. And it's been like battered about like a ping pong ball. And if you carefully read it, what he's basically saying is, is I took the component elements, the digital framework that sets up the box on the page where it's supposed to go, and I put it there. And that's what I did. He said I did not remove, there are declarations from Skip Elkins saying he did not remove the CMI information for the purpose of infringement. You may want to reserve the rest of the time for your colleague. Thank you. Good morning, Your Honors. Lyle Ishida and I represent Jay Katawaki, the general contractor in this case, and it really was my job to be addressing these DMCA copyright removal issues. All right, well, you can fill in. And let me try to address, in the manner in which the questions have been asked, the positions of the defendants with respect to the copyright removal. First of all, we have to be clear that this is only a copyright removal case. This is not a distribution case. Speak up, please. Oh, sorry. The only allegations in the second amended complaint are for removal. 12-02-B1, that's been held. And I don't think that issue is particularly appealed. As to the question of whether there can be a DMCA award while still maintaining no copyright infringement, very clearly you cannot. And that is based on the language of Section 1202 itself. The very first sentence of Section 1202 says, no person shall without the authority of the copyright owner or the law. So if authority of the law permits the removal of the CMI, you cannot have a DMCA violation. The very first sentence. And so if the copyright license is upheld and there's no copyright violation, there cannot be a DMCA violation for removal. That's one legal point. The second legal point, which was alluded to, is the last part of Section 1202-B, which says that the actor must knowingly or with respect to civil remedies under Section 1203, having reasonable grounds to know that it will induce, enable, facilitate, or conceal an infringement. So an infringement needs to occur. And if there's a license, there's no infringement. There could be a third-party infringement that you, it didn't happen here maybe, but there could be a third-party infringement under that language and still have a valid implied license, correct? Theoretically, that's correct, but not in a removal case. In a removal case, which is the only allegation here, the actor must remove the CMI. And that's where we get to the important parts of Judge Mulway's decisions. So as to the copyright removal claim, which was count five of the second amended complaint, we have both legal issues, which is the authority and the knowing requirement, both of which support the granting of the summary judgment on the DMCA, but we also have the factual basis for which she granted the summary judgment. And the factual basis, as I represent the contractor, I must note that three separate times in her order and in her reconsideration order granting defendant's relief, she specifically mentions my client, Katawaki, as not having any facts whatsoever involving or implicating them in any removal. In fact, her exact language was that Frost Tsuji makes no effort to implicate Katawaki. But with respect to the other defendants, I think it is equally clear. In fact, the only defendant which there is any question whatsoever of any action has to do with bartering. Well, let me ask you another question. Your colleague and opposing counsel, it all seems to boil down to a big fight over $39,000, and now we've got attorney's fees. Okay. So let's just take count five, which you stepped up to the plate to talk about. If before the judge ruled on whether or not there was a valid copyright and implied license, that was disputed, obviously, between the Highway Inn and the Frost Tsuji, correct? And so why, until it's established that there's a copyright, why would we have any fees awarded on count five that related to work before the establishment or the determination of the copyright? Why should there be award of fees for copyright, sorry, the DMC claim before the determination of the copyright? Correct. The first reason is because there's absolutely zero factual basis for this claim. The claim is for removal of CMI, yet there is no evidence whatsoever that any of these defendants removed CMI. None whatsoever. On their opposition, on plaintiff's opposition to that count five counter motion, there is no affidavit, there is no declaration, there is no expert testimony of removal of CMI. There's just no evidence. Let me ask the question then. Assuming there is an implied license, would it even be possible for Highway Inn to violate the Digital Millennium Copyright Act? Let me think about this for one second. If your question is limited only to Highway Inn, the operator and owner, it is theoretical that they could have because they did receive the information, but there is no evidence to show that they manipulated the information or even had access to the computer program which would have gained access into that CAD program. I do want to make one specific point regarding Bargreens, because the only declaration involved here on the copyright management information removal is Mr. Elkins' declaration, and I encourage you to read it very carefully. Mr. Elkins analogizes the work he did to panes of glass. That is, he gets a file or he had the file involving FTA's alleged work, upon which he overlaid his own work and generated his own original file. There's no declaration, there's no testimony, there's no expert witness about cutting and pasting or using the FTA file to generate through a computer or digital means. He analogizes it as a pane of glass that he lays on theirs and then does his work. There is no competing declaration otherwise. That original piece of work was then used and circulated, provided to the replacement architect. Now, that distinction, that the pane of glass analysis versus manipulating the file produced by FTA, is a very, very important distinction in the cases which have been provided in the briefing on both sides. Thank you. Thank you, Your Honor. Just a couple of points, Your Honor. One, let's not misunderstand what a CAD file is. These are layers of digital files, and what Mr. Elkins conceded that he did is he removed one of those layers, the layer that had the title block and CMI on it. So he did remove it, and when the defendants assert that they had no idea, well, let's ask our questions this. Since Katawaki received the pricing set, which had the title block and the CMI on it, and then they started using that later on without that title block and CMI, where did that come from? One of the defendants had to do it. It was either Highway Inn, who we know had the file and transmitted it to Uehara in the old save file that we've referenced, or Bargreen or JKI or Uehara. One of them did it, and remember, we're at a summary judgment level. We did not have a trial on this issue. We were at a summary judgment level. Did you move for summary judgment on the DMCA claim? We did not, Your Honor. We moved simply for summary judgment on the contract. Contract claim. Yes, yes. And we had hoped to make the motions early so that we could try to get the whole matter resolved instead of using a lot of time and money on discovery. But one of the things I want to emphasize, too, since I'm running short of time, is in the Fisher v. Forest case, footnote 17, list the requirements for CMI. It doesn't say, and it clearly says that if there is a removal, there is a DMCA violation. Was there a license in that case or authorization to use? In that case, Your Honor, they were dealing with, there was no copyright. That's what I thought. There was no, yeah. There was no copyright. That was the Bee Honey case, and ultimately there was no copyright. And I have one last question. Is $39,000 the amount that your client feels that it was not paid for the drawings? Thirty-nine thousand and some odd cents was part of the contract claim that ultimately the parties settled, Your Honor. But with respect to the DMCA claim, that claim carries a statutory of $2,500 to $25,000 per occurrence. And counsel's incorrect when he notes that it's only a removal case. It's not. It's removal, distribution, and use. We've talked about that from the outset. Each and every time that they touch it, they use it, or they manipulate it, it's a separate violation, and that's what we were going towards. The last item I would like to point out. So what are we deciding here? Does the DMCA claim? What we would ask, Your Honor, is Bar Green has a potential copyright counterclaim that they can reinstitute if the case is remanded. The only remaining claims in the Second Amendment complaint are the copyright claims. So the DMCA claims and the copyright claims would come back. All the other claims have been resolved in the case. But with remand, those claims would be there. Wait a second. Your appeal still rests on the claim that there's not an implied license and therefore there's a copyright violation, right? Yes, Your Honor. So in a way, the contract claim still remains on the table. But if you've settled that. The copyright side of that contract claim remains. The license side, Your Honor, yes. So you've settled. So really all that remains is attorney's fees and the DMCA, in your view. And copyright infringement and the DMCA claims, yes, Your Honor. All right, thank you. Thank you, Your Honor. The case just argued, Frost-Sugee v. Highway Inn, is submitted. Thanks to all counsel.
judges: Schroeder, D.W. Nelson, McKeown